Conway, Ch. J.
This is a proceeding brought by the trustees under the will of Eliza Lillian Ablett, deceased, to construe her will in order to determine to whom that one-fifth share of the residuary estate should be paid which, under paragraph Seventeenth of the will, the trustees were directed to pay to the London Hospital of Whitechapel, London, England. The Surrogate and the Appellate Division have agreed that the one-fifth share in question should be paid by the trustees to the ‘ ‘ Board of Governors of London Hospital ”. The decree of the Surrogate provides, in part, that the said board “ shall invest and reinvest the same as a separate endowment fund to be known as The Robert Ablett Memorial and the fund shall be applied for research, services, and facilities or other purposes benefiting the patients of London Hospital, as the Board of Governors may deem advisable * * (Emphasis added.) The decree states that the Board of Governors of London Hospital has executed and filed with the Surrogate “ a satisfactory undertaking that it will carry out and administer the Ablett bequest to London Hospital according to the terms of this decree * * #
The testatrix, Eliza Lillian Ablett, died a - resident of the County of Oneida on September 22, 1931, leaving a last will and testament dated September 4,1931 which was duly admitted to probate on December 21, 1931. She had been born in the Limehouse district of Middlesex, England, adjacent to London, on October 16, 1862. As a young woman she had twice been a patient of the London Hospital — in 1891 and 1892 — or about 40 years before she drew her will containing a bequest of one fifth of her residuary estate to the London Hospital. By the terms of her will she made a number of bequests (not relevant here) and the remainder of her estate was placed in trust for the benefit of her stepbrother, James Vincent, of London, England. The said James Vincent was to be permitted to occupy the testatrix’ home at Whitesboro, New York, free of charge and free of expenses, if he so desired. The trustees *268 were authorized upon the death of James Vincent, or in case he did not care to occupy the house in Whitesboro, to ‘ ‘ conduct said house as a Community House for the benefit of the inhabitants of the Village of Whitesboro ’ ’, in which event the trustees were directed to set apart the sum of $50,000 from the residuary estate after the death of the said James Vincent with which to maintain such community house. If the trustees did not deem it advisable or desirable to maintain this residence as a community house, they were directed to “ sell said house and add the proceeds of said sale, together with the principal of said fund, to my residuary estate, to be directed in accordance with the provisions hereinafter set forth.” Under paragraph Sixteenth of her will, the testatrix directed the trustees to “ pay to Stevens-Swan Humane Society of Oneida County, Utica Branch, the sum of # * $5,000 ’ ’. In paragraph Seventeenth she provided: “ Upon the death of James Vincent, and after the deduction of the above bequest [To Stevens-Swan Humane Society], I direct my trustees to divide my residuary estate into five equal parts and to pay one of said parts to the London Hospital of Whitechapel, London, England, to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part I direct my trustees to pay to the Young Women’s Christian Association, Inc., of Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part thereof I direct my trustees to pay to the trustees or directors of the Door of Hope, Inc., 1020 Mathews Avenue, Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part thereof I direct my trustees to pay to Camp Healthmore, Inc., of Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable ; one part thereof I direct my trustees to pay to the trustees or directors of the Central Association for the Blind, Inc., 32 Bank Place, Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable-
*269 “ In case any of the specific legacies mentioned herein shall lapse or become void, I direct that such become a part of my residuary estate.”
James Vincent died on December 20, 1951. The trust fund held for his benefit amounts to approximately $800,000. The right of each of the four local charities to receive a one-fifth share of the residuary estate is conceded by all parties. The principal question to be decided by us is whether the Surrogate and the Appellate Division have properly determined that the one-fifth share of the residuary directed to be paid to the London Hospital of Whitechapel, London, England, should be paid to the Board of Governors of London Hospital. The problem arises by reason of the fact that the Government of Great Britain, by the National Health Service Act of 1946 (9 & 10 Geo. VI, ch. 81), nationalized the hospitals of England.
The four local charities contend that the gift to the London Hospital never vested or, if it did vest, that it was subsequently divested as a result of the passage of the National Health Service Act and that the terms of the will must be read to grant a cross remainder to them. They argue alternatively that, assuming no cross-remainder construction is possible, distribution- should be made to them under the doctrine of cy pres.
The next of kin, who are also appellants, likewise contend that the gift to the London Hospital never vested or, if it did vest, that it was subsequently divested as a result of the passage of the National Health Service Act. However, the next of kin go on to argue that testatrix died intestate as to the legacy bequested to the London Hospital and that the doctrine of cy pres is inapplicable. They argue that the testatrix had a particularized intention as differentiated from a general charitable intent which must be present for the application of cy pres.
The Attorney-General, appearing as statutory representative of the indefinite, uncertain and ultimate beneficiaries of a charitable disposition (Personal Property Law, § 12), supports, in general, the position of the respondent, the Board of Governors of the London Hospital. The Attorney-General argues that the courts should apply that construction which upholds the charitable gift; that the interest bequeathed to the London Hospital vested indefensibly on the death of the testatrix; that the National Health Service Act does not affect the validity of the bequest to the London Hospital and that, even if there were *270 a technical failure, the cy pres doctrine should be invoked to accomplish the same result.
Section 40 of the Real Property Law, which is also applicable to personal property by virtue of the last sentence of section 11 of the Personal Property Law (see Vanderpoel v. Burke, 63 Misc. 545, 547; Brooklyn Trust Co. v. Phillips, 134 App. Div. 697, 701-702), provides: “ A future estate is either vested or contingent. It is vested, when there is a person in being, who would have an immediate right to the possession of the property, on the determination of all the intermediate or precedent estates. It is contingent while the person to whom or the event on which it is limited to take effect remains uncertain. ’ ’ Applying the above section to the case before us, it is obvious that there is no contingency here. On the date of testatrix’ death, there was in existence a charitable institution located in White-chapel, London, England, commonly known as the London Hospital (operated by the Governors of the London Hospital, “ made up in unlimited numbers of those who contribute specified sums, some of whom, if they contribute small sums, are annual Governors or members, and others, who may contribute larger sums, become life members ”), which had the immediate right to possession of a one-fifth share of the. residuary estate upon the death of James Vincent. It must also be remembered that, “ The law favors the vesting of estates, and, unless a contrary intention is unequivocally expressed, it will not be imputed.” (Matter of Watson, 262 N. Y. 284, 300; see, also, Connelly v. O’Brien, 166 N. Y. 406, 408.)
The appellants’ contention” that the legacy did not vest in the London Hospital is not based upon “ a contrary intention unequivocally expressed ”, but upon the so-called “ divide and pay over rule”. That rule is, in substance, this: Where the only words of gift are found in a direction to divide and pay over at a future time, the gift will not be ranked with those in which the payment or distribution only is deferred — vested gifts — but will be ranked with those in which time is of the essence of the gift — contingent gifts (see, e.g., Wright v. Wright, 225 N. Y. 329, 335-336; Matter of Crane, 164 N. Y. 71; Smith v. Edwards, 88 N. Y. 92; Matter of Curtis, 252 App. Div. 256, 259). However, the “divide and pay over” rule is not a rule of law. It is, rather, a canon of construction applied only in an effort to answer the primary question, namely, the inten *271 tion of the testator, and, is, therefore, of course, subordinate to that intention and may not be applied if destructive thereof. (See Fulton Trust Co. v. Phillips, 218 N. Y. 573; Matter of Crane, 164 N. Y. 71, supra; Matter of Levy, 171 Misc. 431, 434.)
Here, the direction is to divide the residuary estate into five equal parts and to pay one of the parts to each of five charities specified by name, all of which were in existence at the time testatrix executed her will and on the date of her death. A remainder gift to named remaindermen in existence at the date of a testator’s death imports immediate vesting. Certainly there is no justification for a holding that the remainders to the five charities could not vest consistently with the intention of the testatrix. It seems apparent from the will that the posponement of payment to the five charities was for the sole purpose of letting in an intermediate estate—a life estate for testatrix’ stepbrother. "Where such is the case “ the interest shall be deemed vested at the death of the testator and the class of legatees is to be determined as of that date, for futurity is not annexed to the substance of the gift.” (Matter of Crane, 164 N. Y. 71, 76, supra.)
In support of their claim that the divide and pay over rule is applicable here, the appellants cite Wright v. Wright (225 N. Y. 329, supra). As Surrogate Delehawty said in Matter of Chaim (168 Misc. 923, 929): “ In that case the gift was upon condition that the corporate legatee should at all times be maintained as a free circulating library. The legatee had ceased to exist as a library prior to the death of the life beneficiary. "While the decision in that case refers to the divide and pay over rule its value as a precedent on the question of the time of vesting of a remainder interest is now in serious doubt. In United States Trust Co. v. Taylor (193 App. Div. 153, 159; affd., 232 N. Y. 609) the Appellate Division stated: ‘ The contention of the respondent that the Embree case [9 App. Div. 602; affd., 154 N. Y. 778] has in effect been overruled by the Court of Appeals in Wright v. Wright (225 N. Y. 329) is not sound. The estate in the Wright case was contingent upon a condition that “ it [the library] shall be maintained at all times as a free circulating library.” Such a bequest was clearly conditional and did not come within the definition of a vested estate as stated in section 40 of the Beal Property Law, which reads as follows: “ A future estate * * * is vested when *272 there is a person in being, who would have an immediate right to the possession of the property, on the determination of all the intermediate or precedent estates. It is contingent while the person to whom or the event on which it is limited to take effect remains uncertain.” ’ ”
The present case is dissimilar from the Wright case (supra) in that no words of condition are attached to the gifts to the five charities. It is basic, of course, that the “ language of each will leads to its own conclusion. No two persons are alike; neither are their wills. Every one has his own peculiar family history, temperament, duties and responsibilities. No two estates are alike. How, then, can we expect one will be a pattern for another % This is one field where standardization has proved ineffectual. We still take each document on its own merits. Either for good or ill, a testament has no progeny. Each is a new creation.” (Matter of Watson, 262 N. Y. 284, 297-298, supra.) In our judgment, the instrument presently before us demonstrates an intention by the testatrix to confer a vested remainder upon each of the five charities named in the residuary clause of her will.
That brings us to the main question, viz., whether the gift to the London Hospital became divested by reason of the passage by the British Parliament of the National Health Service Act. Before a divestiture may properly be declared there must be a showing that the testatrix’ intention, as expressed through her gift to the London Hospital, cannot be carried out as a consequence of the National Health Service Act.
The London Hospital at Whitechapel, a voluntary hospital, was organized as an unincorporated association in 1740. Eighteen years later it was incorporated by royal charter in the reign of George the Second. Whitechapel, where the hospital is located, is in the east end of London, the poorest section of the city. It has been so for at least 200 years. About 60% of the hospital’s patients come from the east end of London. Prior to the enactment of the National Health Service Act, the London Hospital was operated by the “ Governors of London Hospital”. As we have already indicated, the membership of the “ Governors ” was made up of those who contributed specified sums of money. Pursuant to the charter of the corporation, the Governors elected, annually, a house committee or board of directors, which body was charged with *273 the management of the hospital. They also managed the medical college which is a part of the institution known as the ‘1 London Hospital ’ ’.
Up to the time of the First World War, 95% of the patients were treated free at the London Hospital. A few people gave donations. During the First World War, because of a rise in taxation and costs the London Hospital, like all other hospitals in England, found itself in great financial stress. As a result, in 1920, the National Health Fund was set up to help the voluntary hospitals of England. From that time on each patient was interviewed and was asked to pay according to his means. In addition, savings associations (hospital insurance similar to our Blue Cross) were started. Between the First and Second World Wars the London Hospital “managed to exist, but we were under great difficulties ”.
During the course of the Second World War the hospitals in England were compelled to minister to the needs of great numbers of people injured in air attacks and who would not otherwise have required any hospital care. The problem thus faced by the London Hospital was aggravated by the fact that it was bombed 20 times, with great destruction of buildings and equipment. The economic situation of hospitals became critical. The National Health Service Act was Parliament’s answer to the problem. It had the nonpartisan support of all groups in the nation and of all political parties and, so, in a very real sense may be described as the will of the people of England. However that may be, the wisdom or lack of wisdom of the adoption by Parliament of the Act cannot rightfully be of concern to us in resolving the issue presented by the present appeal.
From the effective date of the National Health Service Act, the Minister of Health was charged with the duty of making health services in Great Britain available to everyone regardless of his ability to pay. Those services included medical treatment at home or at offices of designated physicians, dental and opthalmological services and hospitalization for all who required it. With respect to hospitalization some special accommodations are set aside for patients who undertake to pay at prescribed rates. Those are available, however, only after all others who are entitled to treatment are provided for (Act, §§ 4, 5). The expenses incurred by the Minister of *274 Health in the exercise of his functions under the Act are to be defrayed out of moneys provided by Parliament (Act, § 52, subd. [I]).
On and after the effective date of the Act, there has continued to be a hospital on the same premises as the London Hospital. The staff of the London Hospital has not been disturbed by the Act; the functions have been continuous and research has been carried on virtually uninterruptedly. The same buildings are used; the same plant and equipment are employed; and the poor people dwelling in the same section of the same city are still served free of charge. The clinics and various departments of the hospital have remained the same, or have been enlarged, as the widening scope of medical services has made such changes necessary in the interests of sound progress in the medical arts. The London Hospital Medical College has continued to function and on substantially the same basis as before in training large numbers of both medical and dental students. Captain Brierley, who is secretary of the old Governors of London Hospital and has been a member of the staff of London Hospital for over 24 years, is presently serving as the chief executive officer and secretary of the new Board of Governors of the London Hospital, the body appointed, pursuant to the Act, to administer the hospital. Policies with reference to employment have not been changed. The group of employees, numbering approximately 2,200, which had served the Governors of the London Hospital, have been carried over and have been serving the Board of Governors of the London Hospital. As before, the top administrative boards are uncompensated.
The changes effected by the Act are several. We have already referred to the fiscal change, namely, that the expenses incurred by the Minister of Health in discharging his functions to provide the people applying at the London Hospital with hospital and specialist services are to be defrayed out of moneys provided by Parliament. The other changes pertain to the ownership and management of the physical properties and endowment funds.
Prior to the effective day of the Act or “ appointed day”, the Minister of Health designated the London Hospital as a teaching hospital, which means that it is affiliated with a medical college. Subdivision (8) of section 11 of the Act provides *275 that the minister shall, in the case of any hospital so designated, constitute, in accordance with Part III of the Third Schedule to the Act, a Board of Governors for the purpose of exercising functions with respect to the administration of that hospital.
Such a Board of Governors, consisting of 29 members, was appointed by the Minister of Health, to administer the London Hospital. Eight members of the medical staff of the old Governors of the London Hospital and eight members of the old house committee of the Governors became members of the new Board of Governors. The Board of Governors is a body corporate with perpetual succession and a common seal (Act, 3rd Schedule, Part IV).
On the appointed day the Governors’ ownership and control of the hospital was divested without compensation. Title to the physical properties of the London Hospital were transferred to and vested in the Minister of Health (Act, § 6). The equipment and facilities previously used in connection with the medical college became vested in the London Hospital Medical College, a new college corporation organized under the Act. So-called “ free funds ”—property or funds such as certain endowments not obtained from a public source like the Chancellor of the Exchequer—were transferred to and vested in the new Board of Governors (Act, §§ 7, 60). And, section 59 of the Act declares, in part, that the “ Board of Governors of any teaching hospital * * * shall have power to accept, hold and administer any property upon trust for purposes relating to hospital services or to the functions of the Board * * * under Part II of this Act with respect to research.” The free funds received by the board play an important role in the operation of the London Hospital since only basic needs are met by contributions from the government.
The appellants complain of the fact that, under section 60 of the Act, the Board of Governors is required to apply endowment funds for the purposes specified in the trust instrument only in “ so far as practicable ”. They urge that the phrase “ so far as practicable ” enables the Board of Governors to ignore a testator’s wishes and to divert a legacy from the purposes envisioned by a testator. We do not feel that any such unreasonable intention is to be attributed to Parliament. We agree with the respondent that those words were inserted into *276 the Act for the reason that it was anticipated that the radical administrative changes effected by the Act might make literal compliance with the limitations of a gift impracticable. In the present case it may be said that literal compliance with the terms of Mrs. Ablett’s will is practicable. In our judgment, the courts below have correctly construed the words “ so far as practicable ’ ’ as placing an obligation on the Board of Governors of a hospital to comply with each trust instrument as implicitly and literally as is reasonably possible. Some evidence of the fact that the British Parliament did not intend to confer upon a Board of Governors the arbitrary power to disregard trust provisions is to be found in the provisions of subdivision (7) of section 7 of the Act which declares, in part: “ Every Board of Governors * * * shall, in the case of any endowment transferred to them under this section, * * * secure, so far as is reasonably practicable, that the objects of the endowment and the observance of any conditions attaching thereto, including in particular conditions intended to preserve the memory of any person or class of persons, are not prejudiced by the provisions of this section.”
Appellants also contend that the “ free funds ” are not free funds within the accepted and normal meaning of that term, but are actually under the control of the British Government. However, as we have already shown, the free funds are under the control of the Board of Governors, the statutory corporation which succeeded to the duties of the old Governors, and not under the control of the Minister of Health and that such funds are to be applied by the board, so far as practicable, for the purposes specified in the trust instrument. The Act provides for governing bodies composed of distinguished medical men. We cannot assume that such men will become mere governmental puppets or that the National Health Service Act, which was enacted to place the hospitals of Great Britain on a solvent basis, was also enacted as a means of enriching the British Treasury. There is little reason to believe that Parliament will find that the operation of free hospitals will prove to be a profitable venture.
We think it also worthy of note that the chief executive officer of the London Hospital testified that the hospital submits to the Minister a budget indicating the amount of money it believes will be required to run the hospital. The amount *277 appropriated by the Chancellor of the Exchequer is the amount required to run the hospital, less the amount of anticipated income from patients. The free funds apparently are not included in the calculation and are additional to Exchequer maintenance.
The appellants argue, however, that free funds are not needed for research since section 16 of the Act provides that ‘ ‘ the Minister may conduct, or assist by grants or otherwise any person to conduct, research into any matters relating to the causation, prevention, diagnosis or treatment of illness or mental defectiveness.” It will be observed that this grant of power to the Minister is not mandatory but permissive only. The fact is that, since the effective date of the Act in 1948, the Minister of Health has not included in the budget of the London Hospital any sum of money for research purposes.
The testatrix here clearly intended by her gift to the London Hospital to assist in the care and healing of the sick, as that work was and would in the future be carried on in the London Hospital.
The reference to the ‘1 board of managers or directors ”, shows that neither she, nor the draftsman of the will, which was drawn practically on her deathbed, had made any inquiries to obtain the exact name of the governing body, but relied wholly upon the description of the hospital. Since she made her gift in perpetuity, she must have assumed that the management or administration might change. She did not designate the beneficiary as a voluntary hospital, run by any particular board of managers, or in any particular fashion. She simply made the gift to the hospital by the name by which she had known it. What the testatrix plainly intended to designate was an institution, a hospital which had been known throughout her homeland for almost 200 years as “ The London Hospital ” and in which she had received care. By describing the same as “ the London Hospital of Whitechapel, London, England ”, she plainly intended to designate the buildings, facilities and the establishment generally, with which she had been familiar from her early life in Whitechapel.
The Board of Governors have given their undertaking to the effect that: “* * * all property and monies, including both principal and income accrued thereon prior to the delivery and payment to us of the said property and monies and received *278 by this said Board of Governors of the London Hospital under the provisions of the said Last Will and Testament of the said Eliza Lillian Ablett, dated September 4, 1931, and duly admitted to probate on December 21, 1931, * * # shall be deemed to represent a distribution of principal and shall be invested as principal, and shall thereafter be reinvested and retained as a separate endowment fund, to be known as ‘ The Robert Ablett Memorial Fund,’ and all net income from such Fund and the investments thereof will be applied exclusively for research, services, facilities or other purposes benefiting the patients of the London 'Hospital, all as the Board of Governors of the London Hospital may deem advisable.” (Emphasis supplied.)
In our opinion, the testatrix’ charitable purposes, as set forth above, can be fulfilled notwithstanding the passage of the National Health Service Act.
There is no substance to the argument that identity with the institution named in the will has been lost for the reason that the class of people now treated at the hospitals is different from the class which testatrix intended to benefit and that her charitable intent will be frustrated by payment to the presently existing institution. The poor whom testatrix intended to benefit were not legislated out of existence by the National Health Service Act nor was the London Hospital shorn of its charitable character by the Act. Before the Act the poor were treated without charge at the London Hospital.' They are still so treated at the London Hospital. What the Act does is to secure the hospital against deficits. It does not change the class of people treated.
Since we have concluded that the legacy should be paid to the Board of Governors of the London Hospital, we find it unnecessary to determine the question of whether the residuary clause should be construed as providing for cross remainders in the event of a lapsing.
The final question is whether it was contrary to law and an abuse of discretion for the Surrogate to charge the allowances against the entire remainder of the trust rather than against the one-fifth share bequeathed to the London Hospital.
The Surrogate charged the allowances against the entire residuary estate on the theory that the appellants would have gained a substantial amount if their contention had prevailed *279 and that there was no reason to penalize the successful party for the benefit of the unsuccessful parties thereby destroying the legacy by indirection. In affirming the Surrogate’s decree, the Appellate Division wrote: ‘ ‘ * * * the appellant charities sought to benefit by a construction that the share of respondent had lapsed, contending vigorously for the entire residuary estate, and it seems inequitable to burden the share of the victorious party with the payment of fees for the losers’ attorneys. He who stands to gain should also stand to lose. The Surrogate has exercised his discretion, which is founded on a good reason and seems to be in accord with the usual practice in construction proceedings, which in a sense are beneficial to the entire estate by clarifying the will (Surrogate’s Ct. Act, §§ 231-a, 278; Matter of Upjohn, 304 N. Y. 366; Matter of Fowler, 265 App. Div. 617; Matter of James, 264 App. Div. 885; Matter of Chaves, 143 Misc. 872; Matter of Seyfried, 176 Misc. 759; Matter of Curley, 161 Misc. 391).”
We think nothing more need be said on the subject of allowances.
The order should be affirmed, with costs to all parties appearing separately and filing separate briefs, payable out of the general fund.